UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-MJ-02262-RN

**United States of America**,

v.

**Daren L. Humphrey**,

         Defendant.

**Order**

On January 19, 2016, the Government filed a Criminal Information against Defendant Daren L. Humphrey that charged him violating North Carolina General Statute § 20-138.1, driving while impaired ("DWI"), as assimilated by 18 U.S.C. § 13(a). After Humphrey pled not guilty to the soled count of the Information, the undersigned magistrate judge conducted a bench trial on April 25, 2016. After reviewing the entire record, considering all of the testimony, reading each exhibit, and assessing the credibility of the witnesses, the court enters the following findings of fact and conclusions of law.[1] As explained below, the court finds that the Government failed to establish beyond a reasonable doubt that Humphrey was under the influence of an impairing substance while driving his vehicle. Because the Government has not met its burden of proof, the court adjudges Humphrey not guilty of the sole count of the Criminal Information.

**I.**     **Background**

On a cold, windy evening on December 6, 2015, between the hours of 9:30 p.m. and 10:00 p.m., Jacqueline Humphrey arrived to her home located on a cul-de-sac within Fort Bragg.

---

[1] To the extent any finding of fact should be designated as a conclusion of law, it should be considered a conclusion of law. Similarly, to the extent any conclusion of law should be designated a finding of fact, it should be considered a finding of fact.

Audio Tr. of Apr. 25, 2016 Bench Trial at 9:10:56–9:11:02, 9:40:30–34, 10:36:39–54, 11:41:36–42. She went to bed between 10:30 p.m. and 11:00 p.m. (*id.* at 9:15:40–46) and awoke at approximately 2:30 a.m. (*id.* at 9:25:30–39, 9:34:57–0:35:05) to her estranged husband, the defendant, standing in her room (*id.* at 9:15:47–55). The two argued for approximately twenty minutes, moving between the ground floor and the second floor of the home. *Id.* at 9:25:30–39, 9:18:50–9:19:15. While they were arguing, Ms. Humphrey observed her husband's clothes on the ground floor of the home. *Id.* at 9:18:26–32. Their argument ended when Ms. Humphrey called the Military Police and the defendant left the home. *Id.* at 9:19:36–48, 9:20:33–35. When the police arrived, Ms. Humphrey noticed that her husband's vehicle, a white Ford F-150, was parked on the street. *Id.* at 9:21:34–43. The truck had not been there when she arrived home earlier in the evening. *Id.* at 9:14:56–9:15:25, 9:21:22–31. According to Ms. Humphrey, there was no alcohol and no empty alcohol containers in the home that evening. *Id.* at 9:23:38–9:24:01.

SPC Stephen Perez responded to Ms. Humphrey's call shortly before 3:00 a.m. *Id.* at 9:34:57–9:35:05. When he arrived at the residence, he noticed a white Ford F-150 parked perpendicular to the curb with its front tires up on the curb. *Id.* at 9:39:33–9:41:00. Lying near the truck were two knocked down trash cans. *Id.* at 9:41:41–9:42:09. SPC Perez questioned Ms. Humphrey for approximately twenty minutes and left around 3:20 a.m. *Id.* at 9:34:57–9:35:05, 9:48:37–47.

SPC Tyler Holland also responded to Ms. Humphrey's call shortly before 3:00 a.m. *Id.* at 10:07:10–22. However, he stopped en route and searched for a male suspect on foot wearing shorts, a t-shirt, and no shoes. *Id.* at 10:07:34–10:11:49. Holland encountered an individual matching the description and attempted to make contact with him. *Id.* at 10:12:20–39. The

2

individual refused to identify himself and Holland radioed for backup. *Id.* at 10:13:13–27, 10:13:58–10:14:02. Holland's supervisor arrived approximately ten minutes later, at which time the individual identified himself as "Humphrey, Daren." *Id.* at 10:14:10–10:15:00. During the encounter, Holland smelled alcohol on Humphrey's breath, noticed that Humphrey's movements were slow and sluggish, and observed that Humphrey had a delayed response to his orders. *Id.* at 10:18:40–51, 10:19:14–52. Five minutes after Holland's supervisor arrived to the scene, Humphrey was arrested for domestic assault and transported to the Provost Marshal Office ("PMO"), located approximately seven minutes away. *Id.* at 10:16:52–10:17:01, 10:28:45–10:29:03, 10:29:10–18. They arrived to the PMO around 3:30 a.m. and Holland took Humphrey to the Intoxilyzer Room. *Id.* at 10:11:35–49, 10:28:45–10:29:31. Holland then escorted Humphrey to the restroom at some time between 3:30 a.m. and 4:27 a.m. and observed that Humphrey was swaying, had difficulty hitting the urinal, and was unable to locate the soap bottle. *Id.* at 10:22:48–10:25:07, 10:29:38–51, 10:36:40–46, 10:44:40–50, 10:48:00–03.

SGT Christopher Stallings, a traffic accident investigator, also arrived to the PMO around 3:30 a.m. because he was notified of a possible DWI. *Id.* at 10:11:35–49, 10:28:45–10:29:51, 10:36:06–18. He spent between five and ten minutes observing Humphrey and noticed that Humphrey smelled of alcohol, had slurred speech, and had a delayed response to questions. *Id.* at 10:36:06–18, 11:41:36–42. Stallings then went to the Humphrey residence, which was located approximately six to seven minutes away, and asked Ms. Humphrey if he could search the truck. *Id.* at 10:36:28–46, 10:38:06–17, 10:39:13–18. She consented, but first had to look for the keys as she believed that they were in her husband's possession. *Id.* at 9:22:55–9:23:06, 9:29:40–9:30:07. She found the keys on top of the refrigerator and gave them to Stallings. *Id.* at 9:22:22–9:23:06. Stallings's search of the truck's cabin revealed Humphrey's wallet, Humphrey's shoes,

3

and an open container of alcohol. *Id.* at 10:40:36–46. Stallings also found empty beer cans in the bed of the truck. *Id.* at 10:41:51–10:42:15. According to Stallings, the hood of the truck and the cabin were still warm and the open container of alcohol was still cool. *Id.* at 10:39:21–23. Based on these temperature assessments, Stallings concluded that the truck had been driven no more than thirty minutes prior to his search. *Id.* at 11:44:00–06. Stallings spent approximately 25 to 35 minutes at the Humphrey residence. *Id.* at 10:44:40–50.

When Stallings returned back to the PMO, he read Humphrey his implied consent rights twice. *Id.* at 10:48:46–52. Stallings finished reading the rights at 4:27 a.m., waited thirty minutes because Humphrey asked to call an attorney, and, at 4:57 a.m., started the intoxilyzer test. *Id.* at 10:48:00–03, 10:48:46–52, 10:51:01–08. Humphrey's first two attempts produced insufficient breath samples: he exhaled partially through the straw and partially through his mouth on the first attempt and exhaled through his nose on the second attempt. *Id.* at 10:53:29–10:54:19. At 5:07 a.m., Stallings gave Humphrey two more attempts to provide a sufficient breath sample. *Id.* at 10:56:01–06. Humphrey was again unable to provide a sufficient sample, so Stallings marked Humphrey down as a refusal at 5:12 a.m. *Id.* at 10:56:36–10:57:49, 10:58:09–13.

Subsequently, the Government filed a Criminal Information against Humphrey, charging him with a violation of 18 U.S.C. § 13, assimilating North Carolina General Statute §20-138.1, which prohibits a person from operating a motor vehicle upon a street, highway, or public vehicular area while under the influence of an impairing substance and/or after having consumed sufficient alcohol that he had, at a relevant time after driving, a blood alcohol concentration of 0.08% or more. Humphrey entered a plea of not guilty on February 3, 2016.

## II. Analysis

### A. Overview of the Charged Offense

Daren Humphrey is charged with violating North Carolina General Statute § 20-138.1 ("DWI"), which provides in relevant part that "[a] person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within this State … [w]hile under the influence of an impairing substance." N.C. Gen. Stat. § 20-138.1(a)(1). Although a violation of § 20-138.1 is a state law crime, Humphrey is charged with a federal crime through the Assimilative Crimes Act, 18 U.S.C. § 13. Under the Assimilative Crimes Act, those who commit criminal acts on federal reservations are subject to prosecution under state law if there is no applicable federal law specifically prohibiting the criminal conduct. *United States v. Minger*, 976 F.2d 185, 187 (4th Cir. 1992). When a state law is assimilated under the Assimilative Crimes Act, federal courts look to state law for the elements of the crime. *Id.* However, the federal law of evidence, not state law of evidence, governs the proceeding. *United States v. Van Hazel*, 468 F. Supp. 2d 792, 798 (E.D.N.C. 2006).

In order to prove Humphrey guilty of DWI, the Government must establish three elements beyond a reasonable doubt: (1) Humphrey was driving a vehicle, (2) he was driving that vehicle upon a street, highway, or public vehicular area on Fort Bragg Military Reservation, an area within the special maritime and territorial jurisdiction of the United States, and (3) at the time he was driving the vehicle, he was under the influence of an impairing substance. *See* N.C. Gen. Stat. § 20-138.1(a)(1); N.C.P.J.-Crim. 270.20A (2014); *see also* 18 U.S.C. § 13(a).

A person is under the influence of an impairing substance when he takes or consumes "a sufficient quantity" of an impairing substance such that there is "an appreciable impairment" of his mental or bodily faculties. N.C.P.J.-Crim. 270.20A (2014); *see also* N.C. Gen. Stat. § 20-

5

4.01(48b). An impairing substance includes alcohol. N.C. Gen. Stat. § 20-4.01(14a). "The fact that a motorist has been drinking, when considered in connection with faulty driving or other conduct indicating an impairment of physical and mental faculties, is sufficient *prima facie*" to show appreciable impairment. *State v. Norton*, 231 N.C. App. 75, 79, 712 S.E.2d 387, 390 (2011) (internal quotation marks omitted) (quoting *State v. Coffey*, 189 N.C. App. 382, 387, 658 S.E.2d 73, 76 (2008)).

B.     Discussion of Evidence Presented at Trial

Although there is evidence that Humphrey drove a vehicle and that he was under the influence of an impairing substance on the night in question, there is insufficient evidence to establish beyond a reasonable doubt that Humphrey drove a vehicle *while* under the influence of impairing substance. The evidence establishes that Humphrey drove on the evening in question—his truck was not at the Humphrey residence when Ms. Humphrey arrived home between 9:30 p.m. and 10:00 p.m., and it was there when officers responded to the residence around 3:00 a.m. There is also evidence that Humphrey was under the influence of alcohol: he smelled of alcohol, had slow and sluggish movements, was delayed in his responses, was swaying, and was unable to properly hit a urinal in the restroom. However, the other evidence presented at trial does not establish beyond a reasonable doubt that Humphrey drove while under the influence of alcohol. As a result, the court will find Humphrey not guilty of the sole count of the Criminal Information.

Humphrey was apprehended while on foot—not while he was driving—so the Government pointed to the manner in which the truck was parked, the knocked-down trash cans, the empty beer cans in the bed of the truck, the warm engine and cabin, and the cool open container of alcohol as evidence of Humphrey's impaired driving. However, the temperature

6

assessments of the engine, cabin, and open container are improbable given the timeline of the events that occurred that night. As already noted, the truck was not at the Humphrey residence when Ms. Humphrey arrived home, but it was there around 3:00 a.m. Because Ms. Humphrey awoke to Humphrey standing in her room around 2:30 a.m., Humphrey could have arrived to the residence at any time between 9:30 p.m. and 2:30 a.m. Police arrived to the residence around 3:00 a.m. and left around 3:20 a.m. During that time, Humphrey was arrested at another location and transported to the PMO. He arrived at the PMO around 3:30 a.m. and was observed by Stallings for five to ten minutes. Stallings then drove approximately six or seven minutes to the Humphrey residence to inquire about the truck. By the time Stallings arrived at the Humphrey residence, it was approximately 3:45 a.m. Stallings examined the truck and concluded that it had been driven no more than thirty minutes prior to his examination. Even if the court were to conclude that Humphrey drove around 2:30 a.m., Stallings's conclusion is improbable as Stallings examined the truck more than an hour after the Humphreys' argument. Furthermore, Stallings testified that the night in question was a cold December's night. Thus, the only credible evidence offered at trial of Humphrey's impaired driving was the way in which the truck was parked, the knocked-down trash cans, the open container, and the empty beer cans.

The manner in which the truck was parked, the nearby knocked-down trash cans, the open container of alcohol, and the empty beer cans are insufficient to establish beyond a reasonable doubt that Humphrey drove while impaired. The fact that a motorist has been driving along with evidence of faulty driving or other conduct showing impairment of mental and physical faculties is sufficient *prima facie* to show appreciable impairment. *State v. Norton*, 231 N.C. App. 75, 79, 712 S.E.2d 387, 390 (2011). Here, the container of alcohol, the empty beer cans, and Humphrey's actions are evidence that Humphrey drank at some point that night.

7

However, there was no evidence that the empty beer cans were from the night in question and the court is left to guess as to whether Humphrey drank them that night or another night. Similarly, the court is left to guess as to whether Humphrey drank the open container of alcohol before he drove or after he parked. Furthermore, while the way in which the truck was parked was unusual, and it is certainly possible that the truck hit the trash cans, this is not enough to convince the court of Humphrey's faulty driving. As already noted, Humphrey was estranged from his wife and it was a windy night. There were no witnesses who saw the truck hit the trash cans, so it is possible that Humphrey or the wind—not the truck—knocked them down. Because "[a] verdict based on conjecture cannot in justice and good conscience be permitted to stand," *State v. Hewitt*, 263 N.C. 759, 763–64, 140 S.E.2d 241, 244 (1965), the court finds that the Government failed to prove beyond a reasonable doubt that Humphrey was under the influence of alcohol at the time he drove his vehicle. Therefore, the court adjudges Humphrey not guilty of the sole count of the Criminal Information.

### III. Rule 26.2 Motion

At trial, Humphrey made an oral motion for production for Stallings's sworn statement under Rule 26.2 of the Federal Rules of Criminal Procedure and an oral motion to strike Stallings's testimony if the statement could not be provided. Audio Tr. of Apr. 25, 2016 Bench Trial at 11:04:04–16. The court ordered production of the statement, *id.* at 11:23:42–49, and the Government stated that it could not produce the statement because it had been lost or misplaced, *id.* at 11:30:31–11:31:47. After review, the court determines that it is not necessary to strike Stallings's testimony because the Government's failure to produce Stallings's statement constituted harmless error.

Rule 26.2 provides two sanctions if a party does not follow a court's order to produce or deliver a Rule 26.2 statement. First, "if the party who called the witness disobeys an order to produce or deliver a statement, the court must strike the witness's testimony from the record." Fed. R. Crim. P. 26.2(e). The court imposes the second sanction, a declaration of a mistrial, if an attorney for the government disobeys the order and justice so requires. *Id.* Despite the mandatory language of Rule 26.2(e), courts have discretion in deciding whether to impose sanctions. *See United States v. Riley*, 189 F.3d 802, 805–06 (8th Cir. 1999) ("Despite the mandatory ring of these provisions [Rule 26.2 and the Jencks Act], a district court has discretion to refuse to impose sanctions for noncompliance…."); *see also Goldberg v. United States*, 425 U.S. 94, 111 n.21 (1976) (stating that the harmless error rule strictly applies to Jencks Act material); *United States v. Lewis*, 35 F.3d 148, 152 (4th Cir. 1995) (same). Although Rule 26.2 motions and Jencks Act motions are technically different motions, "Rule 26.2 incorporates the relevant provisions of the Jencks Act without substantive change" so the analysis of the two motions is the same. *United States v. Smith*, 31 F.3d 1294, 1301 n.6 (4th Cir. 1994), *cert. denied*, 513 U.S. 1181 (1995) ("We note, however, that because Rule 26.2 incorporates the relevant provisions of the Jencks Act without substantive change …, the result here would be the same if analyzed under the Rule rather than the Act.").

If a party disobeys a court's order to produce a witness's statement, the court conducts harmless error analysis to determine whether sanctions are necessary. *Goldberg v United States*, 425 U.S. 94, 111 n.21 (1976) (stating that the harmless error rule strictly applies to Jencks Act material); *see also United States v. Lewis*, 35 F.3d 148, 152 (4th Cir. 1995). The harmless error standard is satisfied when the failure to produce the statement did not prejudice the defense, *United States v. Schell*, 775 F.2d 559, 567 (4th Cir. 1985), *cert. denied*, 475 U.S. 1098 (1986), or

9

when the party inadvertently lost or destroyed the statement and there is an absence of bad faith, *United States v. Stalvey*, 966 F.2d 1446, 1992 WL 122288, at *2 (4th Cir. 1992) (per curiam) (unpublished) (citing *Arizona v. Youngblood*, 488 U.S. 51 (1988)). *But see United States v. Truong Dinh Hung*, 629 F.2d 908, 921 (4th Cir. 1980) (stating that "[t]he destruction of Jencks Act material may violate at least the spirit of the Act, even if the material is destroyed without bad faith following a routine procedure," but finding that sanctions were not appropriate because the Jencks Act material was destroyed in the Government agent's capacity as an intelligence agent, not in her capacity as an informer in a criminal investigation). Here, Humphrey was not prejudiced by the Government's failure to produce Stallings's statement because the court adjudges him not guilty of violating North Carolina General Statute § 20-138.1. Defense counsel was able to adequately cross-examine Stallings and establish a timeline of the events in which Stallings participated—a timeline that the court used to find Stallings's temperature assessments of the truck's hood and cabin improbable, *see supra* Part II.B. Furthermore, there was no evidence showing that the Government lost or destroyed Stallings's testimony in bad faith. Accordingly, "it i[s] perfectly clear that the defense was not prejudiced," *United States v. Crowell*, 586 F.2d 1020, 1028 (4th Cir. 1978), *cert. denied*, 440 U.S. 959 (1979), and the court finds that the Government's failure to produce Stallings's statement constituted harmless error. Humphrey's motion to strike Stallings's testimony is therefore denied.

IV.     Conclusion

For the reasons discussed above, the court denies Humphrey's motion to strike Stallings's testimony under Rule 26.2 of the Federal Rules of Criminal Procedure and finds that the Government has failed to show beyond a reasonable doubt that Humphrey violated North

Carolina General Statute § 20-138.1. Therefore, Humphrey is adjudged not guilty of the sole count of the Criminal Information. The Clerk of Court is directed to close this case.

Dated: August 8, 2016

_Robert T. Numbers II_

ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE

11

Case 5:15-mj-02262-RN   Document 19   Filed 08/08/16   Page 11 of 11